# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

James Kevin Kergil, )
        Petitioner )
)
v. )
)
United States of America, )
        Respondent. )
)

Crim. No. 12-cr-00152-CM
Civ. No. 17-cv-04675-CM

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11-14-17

## PETITIONER JAMES KEVIN KERGIL'S  REPLY MEMORANDUM IN SUPPORT OF HIS PETITION TO VACTATE HIS CONVICTION OR REDUCE HIS SENTENCE

## PRELIMINARY STATEMENT

It should be shocking to the Court that the government fails to address, much less resolve, any of the dozen Due Process and constitutional claims that Mr. Kergil raises in his 2255 Petition.  See Doc. 419 for Mr. Kergil's 2255 Petition to Vacate his conviction or Reduce his Sentence, and Doc. 438 for the Government's Opposition Brief (hereinafter "Gov. Opp.").  Not only does the government expose its ignorance to the law of mail and wire fraud nationally in trying to distinguish *Skilling, Takhalov, Weimert,* and especially the Second Circuit's decision in *Countrywide*, it does not even attempt to address the five required elements of mail and wire fraud in Charles Doyle's Report to Congress on Mail and Wire Fraud, which was published in 2011, long after the *Binday* STOLI "scheme" had come to a close.  More importantly, in trying to explain away or distinguish the Second Circuit's decision in *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017), the government actually makes Mr. Kergil's case for him in this extraordinary statement from Page 16 of the Government's Opposition Brief:

As the Second Circuit concluded, in examining its own prior precedents and placing *Binday* in that context, "[t]he common thread of these decisions is that misrepresentations

or non-disclosure of information **cannot support a conviction** under the 'right to control' theory **unless** those misrepresentations or non-disclosures **can or do result in tangible economic harm**." *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017). Gov. Opp. at 16 (emphasis added).

In fact, after reading this quote from the Government's Opposition Brief, the Court would be well within its rights to grant Mr. Kergil's 2255 Petition right now and order his immediate release from prison. In *Finazzo*, not only did the Second Circuit leave fully intact the "tangible harm" theory of *United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994) as quoted in *DiNome* and other Second Circuit cases, the Second Circuit made crystal clear that even in the case of "potentially valuable economic information," a conviction cannot stand under the "right to control" theory unless those misrepresentations or non-disclosures **can or do** result in tangible economic harm. *See Finazzo* at 111. Nowhere in its Opposition Brief does the government show how paying more than $70 million to the carriers, based on their actuarial tables and contractual premium rates determined by the carriers themselves, could or did result in tangible harm to the carriers.

In *Finazzo*, the defendant really did cost his employer upwards of $14 million in economic harm. In *Binday*, Mr. Binday controlled everything and fully intended that his investors would pay every dime of the premiums until the Insureds died. Nowhere does the Indictment or the Second Circuit Opinion in *Binday* allege that the defendants in *Binday* lied about the essential elements of the life insurance bargain which are Age, Gender, and Health, and it is clearly evident that the "scheme" in *Binday* was to pay the full amount of the insurance company determined contractual premiums to the day the insured died. Therefore, the investors in *Binday* intended to pay the full amount of premiums. As the Second Circuit stated in *Binday*:

> Thus, we have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain. *Binday* at 570.

Additionally, nowhere does the government account for the fact that Binday's investors paid in over $75 million in premiums, so even if there were $32 million in "losses" including death benefits and commissions combined – the carriers collectively made a profit in this deal – so there was no way that Binday's misrepresentations or even outright lies **could or did** result in the "tangible economic harm" to the carriers as required by both *Finazzo* and *Mittelstaedt*, much less the actual "concrete" harm required by *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998).

Significantly, the government's own description of Mr. Kergil's conduct to get the Hanni Lennard policies issued by the carriers is not a crime in any of the 50 states. (See Gov. Opp. At 17-18).  While Binday and Mr. Kergil might have lied about Lennard's wealth or reason for the insurance, they did no lie about her Age, Gender, or Health and when the policies were issued, the Binday Investors paid the exact premium charged by the carriers.  In fact, if there was fraud in this case, the carriers would have been successful in rescinding the policies and not paying the death benefits.  See the government's description of Binday and Kergil "scheming to get a massive cut" of the death benefit." Gov. Opp at 17.

As ghoulish and despicable as this conduct might seem, neither STOLI nor the Life Settlement business are illegal.  Nor are lawsuits involving death proceeds uncommon.  *See e.g. Life Product Clearing LLC v. Angel,* 530 F. Supp. 2d 646 (S.D.N.Y. 2008).  The government, in its attempt to make Mr. Kergil look like a "greedy" bad guy, paints a picture of deceitful conduct, but as the Second Circuit has stated repeatedly; "deceit" is not enough, there must be **intent** to do **tangible economic harm** to the alleged victim. See e.g. *Finazzo, Mittelstaedt*, and *Starr.*  In this case, the Binday Investors paid the exact premium demanded by the carriers and even the Insurance Company Executives at trial considered death benefits to be a "cost of doing

3

business" rather than a fraud loss.  Once again, if the death proceeds were "procured by fraud" no carrier would willingly have paid out the death benefit.  Therefore, this is a classic case where there was no intent to harm the carriers but rather to get them to enter into a transaction that perhaps they might not want to enter because of the public's disdain for STOLI type policies and investing in someone's future death.  But STOLI is still legal today and one did not even have to register as a Life Settlement Consultant in New York until 2011.  Thus despite the government's character assassination of Mr. Kergil, the "victim received the full economic benefit of the bargain" and there was no "tangible economic harm" as required by *Finazzo* in this case.

Ironically, the Second Circuit reached the exact same conclusion in *Binday*, where the Court stated:

> "It is not sufficient, however, to show merely that the victim would not have entered into a discretionary economic transaction but for the defendant's misrepresentations.  The "right to control one's assets" does not render every transaction induced by deceit actionable under the mail and wire fraud statutes." *Binday* at 570.

Similarly, on Page 18 of its Opposition Brief, the government makes the gratuitous claim that, in discussing the Good Faith Defense which is the ultimate bar to mail and wire fraud claims, this is the first time that Mr. Kergil has raised that defense:

> Although this is the first time Kergil raises this argument in any form, the Court's instruction regarding intent ensures that there was no error or confusion on the part of the jury in convicting Kergil despite any purported evidence of good faith. Gov. Opp. at 18.

This statement by the government should prove to the Court that not only was Mr. Binday's counsel constitutionally ineffective as a matter of law, so, too, was Mr. Kergil's attorney constitutionally "ineffective" for not doing a post-trial Rule 29 Judgment of Acquittal or a Rule 33 Motion for a New Trial based on the Good Faith Defense.  Therefore, since according to the government, none of the attorneys raised the "Good Faith" defense in a mail and wire

fraud prosecution, that must be *per se* Ineffective Assistance of Counsel because as the Court knows well:

> Good faith would be a complete defense: the burden is on the government to show lack of good faith beyond a reasonable doubt. *United States v. Bronston*, 658 F.2d 920, 930 (2d Cir. 1981).

Moreover, because the government acknowledges in its own Opposition Brief that there was no presentation by the government at trial to show Mr. Kergil's intent to do **tangible** harm by paying the exact premiums that the carriers demanded, or any evidence presented to destroy Mr. Kergil's Good Faith Defense beyond a reasonable doubt; Mr. Kergil is either the victim of egregious Ineffective Assistance of Counsel (because neither his attorney nor Binday's attorney did a post-trial Rule 29 or Rule 33 centered on the Good Faith Defense) or in the alternative the Court's Jury Instructions were erroneous as a matter of law under the "tangible harm theory" of *Mittelstaedt* as recently espoused by the Second Circuit in *Finazzo*, because the words "tangible harm" are nowhere to be found in the Court's Jury Instructions. Nor are the words "absolute concrete harm" as required by *Rossomando* found in the Jury Instructions. And, of course, those terms are nowhere to be found in Mr. Kergil's Indictment. The only details in the Indictment are the horrors and evils of STOLI and Life Settlement transactions, which is still not a crime anywhere in the United States. Life Settlements are advertised every single say, especially to Senior Citizens watching Judge Judy on cable television.

Therefore, based on these and other issues discussed in detail below, Mr. Kergil respectfully asks that the Court set up an evidentiary hearing as early as possible that fits into the Court's schedule, and Mr. Kergil will seek help to procure new counsel to argue these **legal and constitutional** issues before the Court. Unlike Mr. Binday Mr. Kergil seeks a hearing not to discuss newly-discovered evidence, but centuries-old constitutional issues that were ignored in

his case.  Contrary to the government's Opposition Brief, Mr. Kergil did not receive a fair trial, and was clearly prejudiced by the Court's animosity toward Mr. Binday as well as Mr. Binday's counsel's Ineffective Assistance, and the Court did not apply Second Circuit law as described in *Countrywide, Takhalov*, and now *Finazzo* and the Court's interpretations of the Calculation of Loss under the Sentencing Guidelines was clearly erroneous as Mr. Kergil's total portion of the $32 million in losses was at most $600,000, so the Supreme Court's recent decision in *Honeycutt v. United States*, 137 S. Ct. 1626 (2017) undermines the government's theory of mail and wire fraud in the definition of the word "obtain" and the Court's apportionment of more than $600,000 in losses to Mr. Kergil and sentencing him to more than a year and a day.  So, because of the gravity of these constitutional claims, Mr. Kergil respectfully asks that the Court use its Supervisory Powers to release Mr. Kergil on bail pending the disposition of his 2255 Petition so that he can secure new counsel and to effectively argue these substantial issues before the Court on an expedited basis.

## I.     THE MANDATE RULE DOES NOT LIMIT MR. KERGIL'S 2255 PETITION

The government's suggestion that the so-called "mandate rule", which bars relitigation of issues already decided on direct appeal, is applicable here and/or bars any of the constitutional issues that Mr. Kergil raises is both baseless and inappropriate.  The government knows fully well that a 2255 Petition also acts as a motion for reconsideration, especially as to constitutional violations and incorrect sentences, and that any court may "reconsider an earlier decision when it is confronted with an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *United States v. Becker,* 502 F.3d 122, 127 (2d Cir. 2007), *quoting United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000).  To the extent the government wishes to preclude discussion on any and all issues that could have been

raised on appeal, the government is wrong; especially when it comes to new cases and "intervening change" in the interpretation of the law as to Mail and Wire Fraud. The purpose of a 2255 Petition, as well as a motion for reconsideration, is to bring to the Court's attention new intervening changes in the controlling law such as *Countrywide, Finazzo,* and *Honeycutt*, or to point out to the Court constitutional errors that constitute a "manifest injustice" or to point out that the unreasonable sentence was based on outright errors of fact. *See, e.g., Townsend v. Burke*, 334 U.S. 736 (1948).

To show just how out-of-touch the government's arguments are, the government's Opposition cites a 1909 change in the mail fraud statute:

> "…[i]n 1909, Congress amended the statute to prohibit, as it does today, 'any scheme or artifice to defraud, *or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises*…" Gov. Opp. at 26.

Mr. Kergil on the other hand in his brief brings to the Court's attention the Second Circuit's now famous decision in *Countrywide*, which the government amazingly contends supports the jury's decision in *Binday,* and the Supreme Court's definition in 2017 of the word "obtain" in *Honeycutt*. Suffice it to say, based on the Second Circuit's exhaustive study on the history of the mail and wire fraud statutes in *Countrywide*, if there was no "federal fraud" at Countrywide, where taxpayers lost billions of dollars, there was no fraud here because the carriers made a substantial profit after considering the $75 million in premiums paid. In the aggregate, there was no loss to the carriers in *Binday*, whereas the "mortgage" fraud in *Countrywide* was in the billions. *See Carlo and DiNome*, which are the government's banner cases in *Binday* as if lying on an insurance application is the same thing as lying on a mortgage application.

Moreover, the government cites a change in the statute in 1909 adding the word "obtain" to the Mail Fraud statute. Mr. Kergil, on the other hand, submits a 2017 Supreme Court case

defining the word "obtain" for the purpose of the criminal forfeiture statutes.  If the defendant in *Honeycutt* did not "**obtain**," possess, or acquire the ill-gotten cash, then certainly neither did Mr. Kergil in this case.  Contrary to all of the government's erroneous suppositions (see, e.g., the ludicrous "forfeitures" argument on pages 29-30 of the government's Opposition Brief), Michael Binday received 100% of the commissions in this case, whereas Mr. Kergil received a flat $600,000 for services rendered just like the farm boy in the Sentencing Guidelines Commentary describing the adoption of *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011), or the student raising marijuana for the criminal mastermind farmer in *Honeycutt*.  In any event, the government's arguments are all meritless, baseless, inapposite, or totally miss the mark.  Mr. Kergil cares about his "freedom" not about his "forfeitures" which will never be paid because he will be old, retired, and bankrupt before he completes his unconstitutional sentence that was both procedurally and substantively unreasonable, as well as being based on the Court's acceptance of spurious conclusions and false facts by the government that is criminal nowhere in the United States.  The only time Mr. Kergil mentions the word "forfeiture" in his original 2255 Petition is to introduce the Supreme Court's definition of the word "obtain" in *Honeycutt*.  Based on that "definition" of the word "**obtain**", there was no violation of the 1909 statute the government quotes.

If the Court uses the requirement in *Countrywide* that there is no fraud in a contract, no matter how deceitful the conduct of the defendant, as long as the defendant intended to perform on the contract, i.e., pay all of the premiums on the insurance contracts in this case, there was no crime in this case and there was no fraud loss for the purposes of the Sentencing Guidelines.  In fact, that is one of the core "claims" the government has against STOLI; insurance carriers want to collect premiums from people for 30-40 years but then when people hit their 70's and 80's, the

carriers jack up the premiums so the "poor" estate-planning people lapse their coverage. See Gov. Opp. at 12-13. But, if an investor or hedge-fund owns the insurance policy, that somehow "hurts" the carriers because the investors can pay to Age 100, so the carriers can no longer count on defrauding the American people by terminating the insurance before the insureds die. All four of the government's "Evils of STOLI" are actuarial rubbish.

Just so the Court knows, the insurance carriers have long since realized that STOLI portfolios perform much better than "legitimate" "estate-planning" portfolios, because the investors cut their losses on healthy people and the policies lapse, giving the carriers a huge windfall (as was done on most of the policies in this case), whereas truly wealthy people pay for and keep their policies in a family trust until the day they die for tax reasons. The government's claims to the contrary in the Indictment are not supported by the facts, and the American people have brought dozens of class-action lawsuits against Lincoln, Prudential, and Phoenix amongst other carriers to make them accountable for unilaterally raising the premiums, which the Indictment says cannot happen. *See e.g. Mukamal v. Lincoln National*, 17-cv-00234 (E.D. Pa. Jan. 17, 2017).

Furthermore, if Mr. Kergil is correct that *Honeycutt* defines the word "**_obtain_**" for purposes of a criminal statute (as used in 1909), and that *Countrywide* stands for the proposition that the government must prove beyond a reasonable doubt that Binday's investors never intended to fulfill their part of the insurance contract bargain, i.e. paying the premiums on the insurance company priced policies, then needless to say, neither *Countrywide* nor *Honeycutt* are barred by the "mandate rule." If the Supreme Court's definition of "**_obtain_**" is correct, then this Court lacked jurisdiction to pass judgment on Mr. Kergil and his sentence is in violation of the Constitution and the laws of the United States, as well as being a violation of Due Process.

Moreover, if the Second Circuit's historical dissertation of the requirements pertaining to the five elements of mail and wire fraud is correct, including the additional requirement that when a contract is involved (as in this case), the government must prove beyond a reasonable doubt that the defendant at time of signing the contract never intended to pay the premiums.   *See Countrywide* at 658-59.

Therefore, this Court lacked jurisdiction to sentence Mr. Kergil and must vacate his conviction and order his immediate release from prison, because contrary to the government's brief, a 2255 Petition is a perfect place to challenge the Court's jurisdiction.   As a general rule, relief is available under § 2255 for a "constitutional error, a lack of jurisdiction in the sentencing court, or an error of law that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Hardy v. United States*, 878 F.2d 94, 97 (2d Cir.1989) (quoting *United States v. Addonizio*, 442 U.S. 178, 185 (quoting *Hill v. United States*, 368 U.S. 424, 428, 82 (1962))).   See also *Davis v. United States,* 417 U.S. 333, 346 (1974) (defendant who may have been convicted "for an act that the law does not make criminal" entitled to challenge conviction to avoid miscarriage of justice).

## II.   THE SUPREME COURT'S RECENT DECISION IN *MOLINA-MARTINEZ* REQUIRES THIS COURT TO VACATE OR REDUCE MR. KERGIL'S SENTENCE

In *Molina-Martinez v. United States*, 136 S.Ct. 1338 (2016), the Supreme Court reversed a guilty plea sentence of 77 months where the defendant alleged that a lower sentencing range of 70-87 months was the correct sentencing range.   Whereas the Fifth Circuit required Molina-Martinez to show more than just the calculation error, the Supreme Court made it clear that:

> "...the court's reliance on an incorrect range in most instances will suffice to show an effect on the defendant's substantial rights. Indeed, in the ordinary case a defendant will

satisfy his burden to show prejudice by pointing to the application of an incorrect, higher Guidelines range and the sentence he received thereunder. Absent unusual circumstances, he will not be required to show more." *Molina-Martinez* at 1347.

In *Molina-Martinez*, the district court incorrectly believed that 77 months was the lowest possible sentence. The defendant believed the court to be in error and suggested that the correct lowest sentence should be 70 months. While the Fifth Circuit agreed with the defendant that 70-87 months was the correct range, it required the defendant to show more as to how he was prejudiced, when 77 months was clearly between the range of 70-87 months. Because the court in *Molina-Martinez* had made the statement that, based on the Guidelines, the lowest sentence the court could give was 77 months, that was enough for the Supreme Court to reverse and remand the case for a lower sentence.

In this case, Mr. Kergil was a first time offender and **HIS** intended loss was less than the loss in *Manatau*, and the actual loss in this case was zero because the Court (as well as the government) forgot to factor in the premiums paid. The Second Circuit calls the commissions paid in this case "Brokerage Fees," but neglects to point out that if there are no premiums paid in the first place, there will be no "Brokerage Fees" or commissions paid to the agent. Beginning in year two of the typical insurance contract the commission rate falls to two percent or less. Since the total commissions paid are always a fraction of the total premiums paid, there is no way that commissions or "brokerage fees" can be part of the victim's calculation of loss. More importantly, if one does not pay the premium, there is no possibility of any death claim loss either.

Nowhere does the government dispute the more than $70 million paid in premiums by the Binday Investors, and the Court has already pegged the losses at $32 million, including the $11,000,000 in commissions, so it was clear error not to include the "premiums paid" as part of

11

the equation and clear error not to find zero actual losses in this case, and even worse, to attribute more than $600,000 to Mr. Kergil. A district court abuses its discretion when it fails to consider a significant relevant factor, gives significance to an improper or irrelevant factor, or considers proper factors, but in weighing the factors commits a clear error of judgment. As the Second Circuit has stated: "A district court commits procedural error where it makes a mistake in its Guidelines calculation, does not consider the § 3553(a) factors, or rests its sentence on a clearly erroneous finding of fact." See *United States v. Lacey,* 699 F.3d 710, 714 (2d Cir. 2012). See also *Gall v. United States*, 552 U.S. 38, 51 (2007).

Simply put, in attributing the full $32 million in losses to Mr. Kergil rather than just the $600,000 that he received in payments from the Binday Agency for services rendered, the Court committed plain error in applying the wrong Guidelines. That said, under *Molina-Martinez*, which involved a guilty plea and only a mistake of seven months, the mistake in Mr. Kergil's case is **<u>EIGHT YEARS</u>** for a non-crime that he certainly did not commit. Even ignoring the new Sentencing Guideline Amendments 791, 792, and 794, it is clear that Mr. Kergil was grossly over-sentenced based on a clear misinterpretation of the Sentencing Guidelines and the calculation of loss. See the Second Circuit's decision in *United States v. Algahaim,* 842 F.3d 796 (2d Cir. 2016).

Mr. Kergil will deal with the proper calculation of a loss later in this brief as well as the definition of the word "obtain" under the Supreme Court's decision in *Honeycutt* or the adoption of the "intended loss" standard under *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011), and the new definition of "loss" under the Sentencing Guidelines. But for now, the Supreme Court's decision in *Molina-Martinez* makes clear that this Court must grant Mr. Kergil's 2255 Petition because not only was Binday's attorney's performance substandard, Mr. Kergil's

attorney's performance was substandard as well for not challenging the sentence calculation within 14 days after sentencing as required by Rule 35 of the Federal Rules of Criminal Procedure, or submitting a Rule 29 or Rule 33 motion as well. As the Supreme Court has stated that any amount of prison time counts as "prejudice" for the purposes of the Sixth Amendment (*see Glover v. United States*, 531 U.S. 198 (2001)), Mr. Kergil has satisfied both prongs of *Strickland v. Washington.* 466 U.S. 668 (1984) and *Lee v. United States*, 137 S.Ct. 1958 (2017), i.e. substandard performance by his attorney in not submitting a post-trial Rule 29, Rule 33, or even a post-sentencing Rule 35 Motion; and the "prejudice" of receiving a clearly "unreasonable" nine year sentence on a "zero-loss" case for a "non-crime" that he did not commit; whereas Joseph Collins received a one year sentence on a notorious billion dollar fraud in the REFCO case. *See United States v. Collins*, 581 Fed. Appx. (2d. Cir 2014). Other famous cases of hundred-million dollar-plus frauds receiving smaller sentences include Raj Gupta (24 months) and 30, 18, and 12 months for the three defendants in *United States v. Bryson*, 13-cr-00041 (D. Conn. 2013), who ran the multi-billion dollar hedge fund New Stream. Since Mr. Kergil's sentence was both procedurally and substantively unreasonable, the Court should grant his 2255 Petition, reduce his sentence to time served, and order his immediate release from prison.

### III.   MR. KERGIL IS ENTITLED TO HABEAS RELIEF BASED ON A VIOLATION OF THE EX POST FACTO CLAUSE

On Pages 21-22 of the Government's Opposition Brief, it states the following:

Fair notice is a constitutional guarantee grounded in due process which requires a criminal statute "give fair warning of the conduct that it makes a crime." *Lurie v. Wittner*, 228 F.3d 113, 126 (2d Cir. 2000) (*quoting Bouie v. City of Columbia*, 378 U.S. 347, 350 (1964)). In recognition of this general principle, the rule of lenity counsels that "construction of a criminal statute must be guided by the need for fair warning," *Crandon v. United States*, 494 U.S. 152, 160 (1990), but the Supreme Court has noted that it only applies if, "after considering text, structure, history, and purpose, there remains a

grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 478 (2010) (citation and internal quotation marks omitted); *see also United States v. Castleman*, 134 S. Ct. 1405, 1416 (2014). As a corollary to these principles, the "*Ex Post Facto* Clause enshrines in the Constitution a basic presumption of our law, that is, legislation in the criminal law is not to be applied retroactively." *United States v. Kilkenny*, 493 F.3d 122, 126 (2d Cir. 2007) (internal quotation marks omitted)).

The premise of the opinion in *United States v. Kilkenny*, 493 F.3d 122 (2d Cir. 2007) rests on an application of that provision in Article I of the United States Constitution that prohibits Congress from passing any "*ex post facto* Law." *See* U.S. Const. art. I, §9, cl. 3. For that reason it is helpful to state the Second Circuit's understanding of what that means in *Kilkenny*:

> It is hard to improve on the definition of the *Ex Post Facto* Clause set out in an early Supreme Court case, *Calder v. Bull,* 3 U.S. (3 Dall.) 386 (1798). In that case Justice Chase described the following kind of legislation as prohibited:
>
> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action.
>
> 2d. Every law that aggravates a crime, or makes it greater than it was, when committed.
>
> 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.
>
> 4th. Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offence, in order to convict the offender. *See Kilkenny* at 125, *citing Calder v. Bull* at 390.

The main reason for the *ex post facto* clause's adoption in the Constitution was to restrain Congress, **or the Judiciary**, from enacting "arbitrary or vindictive" laws after the conduct was committed. *See United States v. Marks*, 430 U.S. 188 (1977), *citing Rabe v. Washington*, 405 U.S. 313 (1972). The clause also ensures that before being prosecuted, individuals must be given "fair warning" of a law's effect.

14

Blackstone illustrates this second purpose of the *Ex Post Facto* Clause, providing fair warning, by looking to the policies of the Roman despot Caligula:

> "Caligula had laws written in fine print and hung them high up on pillars so that they were not available to nor readable by the Roman citizens affected by such laws. *Id.* They provided no fair warning and so, like laws made *ex post facto,* they would not have provided citizens fair notice to refrain from the criminalized conduct. *Sash v. Zenk,* 439 F.3d 61, 64 (2d Cir. 2006) (notice problems arise when retrospective changes are made in laws upon which citizens are entitled to rely)." *Kilkenny* at 126.

Thus, as the government states, the *Ex Post Facto* Clause enshrines in the Constitution a basic presumption of our law, that is, legislation in the criminal law "is not to be applied retroactively." Gov. Opp. at 22, *citing Kilkenny* at 126, *citing Johnson v. United States,* 529 U.S. 694, 701 (2000).

Based on the prohibition against *ex post facto* judicial determinations and the need to provide "fair warning" as to what is criminal under the law before someone should be criminally prosecuted, the Rule of Lenity should be applied any time that the Court finds, as in this case, that a defendant possibly lacked notice that his conduct was subject to criminal sanction. *See Liparota v. United States,* 471 U.S. 419, 427 (1985) (The rule of lenity "ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between legislature, the prosecutor, and the court in defining criminal liability."); *Bouie v. City of Columbia*, 378 U.S. 347, 350-51 (1964) (Due Process requires that a criminal statute "give fair warning of the conduct that makes it a crime."). "[B]efore a man can be punished as a criminal under the Federal law his case must be 'plainly and unmistakably' within the provisions of some statute." *United States v. Plaza Health Labs Inc.,* 3 F.3d 643, 649 (2d Cir. 1993), *quoting United States v. Gradwell*, 243 U.S. 476, 485 (1917).

Contrary to the government's Opposition, the "Fair Warning" requirement mandates that "no man shall be held criminally responsible for **conduct which he could not reasonably**

**understand to be proscribed**." *United States v. Lanier*, 520 U.S. 259, 260-61 (1987)(emphasis added).  This principle is reflected in at least two tools of statutory construction.  First, the "rule of lenity ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *Lanier* at 266.  Second, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.*

In this case, there is no case anywhere in any circuit where someone was indicted for making misrepresentations concerning the future potential sale of an insurance policy or, even worse, that the policy was for "estate planning purposes."  If someone lies on an insurance policy, the carrier has the civil remedy to rescind the policy and keep the premiums if fraud was involved.  Clearly, Mr. Kergil had no "fair warning" and this is a judicial violation of the *Ex Post Facto* Clause, because none of the conduct in this case is even remotely similar to the conduct for a mail and wire fraud prosecution as described to Congress by Charles Doyle in his Congressional Research Service treatise of 2011, which is well after the applications in this case were filled out and the policies sold.  See Doc. 419, Page 11, for the five elements of Mail and Wire Fraud that must be proven beyond a reasonable doubt.  Therefore, because of this clear violation of the Ex Post Facto Clause, and the lack of "fair warning" in this case, the Court should grant Mr. Kergil's 2255 Petition and order his immediate release from prison.

## IV.    MR. KERGIL WAS NOT GUILTY OF AIDING OR ABETTING AS A MATTER OF LAW

As to Mr. Kergil's aiding and abetting argument, the government's Memorandum of Law in Opposition is wholly without merit (see Gov. Opp. Pages 19-21 therein). The government cites two inapposite cases, *United States v. Schultz*, 333 F.3d 393 (2d Cir. 2003) and *United*

*States v. Labat*, 905 F.2d 18 (2d Cir. 1990). The government submits totally erroneous arguments that do not address the real substance of aiding and abetting.

The government's reliance on the *Schultz* case is misplaced, as *Schultz* had nothing to do with aiding and abetting, but, rather, the jury instructions there related to the doctrine of Conscious Avoidance. And, the *Schultz* jury instructions did not, as here, provide the jury with the alternative legal theory of aiding and abetting upon which to convict that was legally insufficient due to erroneous instructions.

As for *Labat,* that case recites an incomplete version of the full instructions for subdivision (b) of the aiding and abetting statute. The government's quote from *Labat* fails to include the crucial instruction that to convict Mr. Kergil, the jury must find beyond a reasonable doubt commission of the underlying crime by a person other than Mr. Kergil. *See, e.g., United States v. Osorio Estrada*, 751 F.2d 128, 132 (2d Cir. 1985). The Jury Instruction at trial did have the "reasonable doubt" language, but it incorrectly charged the jury that it may find Mr. Kergil guilty if it finds "that the defendant you are considering helped or associated that person in the commission of the offenses." (Doc. 282, Page 1587). Subdivision (b) of the statute does not entail the actions of "helped" or "associated", but the different affirmative act of "causing" the act to be done by a third party: "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." *See* 18 U.S.C. §2(b).  Significantly, at Mr. Kergil's trial, the jury was not instructed as to the critical element that the government must prove that with respect to Mr. Kergil's alleged voluntary act or omission as an aider and abetter, he needed to have the specific intent that his act or omission would bring about the underlying crime. *See United States v. Scotti*, 47 F.3d 1237, 1246 (2d Cir. 1995). Aiding and abetting has a heightened *mens rea* requirement involving

"purpose" (specific intent) as opposed to knowledge (general intent). *Scotti* at 1244-45. The jury was never told that Mr. Kergil must have possessed the requisite mental state of specific intent in order to be found guilty as an aider and abetter. Additionally, if Mr. Kergil did not know that lying on an insurance application was a crime, it would be impossible for him to "aid and abet" on a crime that arguably did not exist prior to the Second Circuit's decision in October 2015 in *Binday*.

More importantly, as discussed earlier, Mr. Kergil lacked any "fair warning" or "fair notice" that his conduct was in any possible way criminal. Again, one could argue that, until the Second Circuit's decision in *Binday* in 2015, no one had ever been accused of mail and wire fraud based on a "right to control" theory of fraud based on misrepresentations on a life insurance application. Certainly, if the government could find such a case, they would have cited it long before now.

Generally, when the government alleges "aiding and abetting" in an indictment, it then provides the jury with an alternative route to find the defendant guilty of the substantive offense. Here, "aiding and abetting" was alleged in Count 2 (mail fraud) and Count 3 (wire fraud). The statutes referenced in Count 2 are 18 U.S.C. §1341 (mail fraud) along with 18 U.S.C. §2 (aiding and abetting). This gave the jury two separate and alternative legal theories to consider in deciding guilt: 1) Whether Mr. Kergil was guilty as a principal actor that engaged in mail fraud; or 2) Whether Mr. Kergil aided and abetted mail fraud, which then makes him guilty as a principal.

But, under *Yates v. United States,* 354 U.S. 298 (1957)*, Griffin v. United States*, 502 U.S. 46 (1991), and *Scotti*, if one of the grounds for the jury to select when deciding guilt is legally

insufficient, then the verdict must be set aside. In *Scotti*, the Second Circuit affirmed the district Court's order granting the co-defendant Rodriguez a new trial, observing that:

> "The problem in this case is that, given the form of the indictment, we do not know whether the jury found Rodriguez guilty as a principal or an aider and abetter. The jury merely returned a general verdict of guilty on Count Seven, and this did not indicate on what theory its verdict rested." *Scotti* at 1247.

Those words could very well have been written for Mr. Kergil, as the problem in this case is that, given the form of the indictment, we do not know whether the jury found Mr. Kergil guilty as a "principal actor" in mail fraud and wire fraud, or as an "aider and abetter" of mail fraud in Count 2 and then wire fraud in Count 3. As the record stands, the verdict on Counts 2 and 3 as an actor are being challenged on various grounds, but could potentially be deemed supportable on the substantive grounds, but certainly not on the aiding and abetting grounds, since it is impossible to tell on which grounds or bases which the jury selected, the convictions on Counts 2 and 3 must be set aside based on *Yates* at 312; *Griffin* at 52, and *Scotti* at 1246.

## V.    THE COURT'S DETERMINATION OF LOSS IN THIS CASE WAS CLEARLY UNREASONABLE AND WAS BASED ON FACTUAL ERRORS

When calculating a loss amount for purposes of sentencing, a district court is required to make a "reasonable estimate" of the loss amount sustained by the fraud victim based on the evidence presented.  U.S.S.G. §2b1.1 cmt. n. 3(C).  In accordance with this provision, the court's estimate of loss amount must include a reduction for the value of any property or collateral returned to the victim, or the value of services rendered to the victim.  U.S.S.G. §2B1.1 cmt. n. 3(E)(i).

On Page 28 of the government's Opposition Brief, the government states that "even if no loss is attributed to the policy outcomes on the STOLI policies that defendants fraudulently

imposed on the insurers, the approximately $11.7 million that the defendants received in commissions constitutes an actual loss to the insurers, which still resulted in a 20 level increase. *Id.* at 599." This commentary goes to the heart of the problem in the sentencing aspect of the Court's opinion. The Court attempted to straddle the line at sentencing and, with its apparent commentary backed up by no case law, actually makes the case for a "do-over" on the Sentencing issues. If there was no actual loss by the carriers, then Mr. Kergil should have been found not guilty under the "tangible economic harm theory" of *Mittelstaedt* and *Finazzo*, or he should have received a sentence of probation of a year and a day based on a First-Time Offender status, and only six points under the Sentencing Guidelines.

The Court gave credence to the "No-Loss" argument on Page 86, by backing up Mr. Kergil's "fundamentally flawed" argument with the government's own testimony of one of two insurance carrier witnesses, James Avery (Page 86, lines 5-13), in stating that "...unless we conclude, which we hesitate to do that...even where there clearly has been some loss, [and in] the absence of a better alternative....We agree the government approach is **unlikely** to yield an accurate measure of the ultimate performance of the pool of policies." (Page 87 lines 5-6) (emphasis added).

While the government is correct that Mr. Kergil did "not articulate any new argument for error with regard to his sentence," and uses that as a basis for saying the challenge fails (Gov. Opp. at 29) in stating that: "Notably, the defendants have not offered an alternative calculation for actual loss, nor is one readily apparent. Indeed, the alternative for which defendants seem to argue is Zero, **BECAUSE THE ACTUAL LOSSES CANNOT BE DETERMINED**" (Page 88, lines 6-7) (emphasis added). The Court, however, again states that "it is not defendants' obligation to establish loss amount" (Page 88, line 8). This is a conflicting statement by the

Court, as it seems to suggest that it is Mr. Kergil's fault for the calculation conundrum, while at the same time it is not his responsibility to calculate the "actual" loss. The Court then negates the government's comments in stating that "on different facts, the method employed here may not provide a reasonable estimate of actual losses." (Gov. Opp. at 93).

The problem with the Court's Sentencing Guidelines analysis as to Mr. Kergil is that the law of the Second Circuit requires that even in an alleged conspiracy, the Court must analyze both the conduct and the "intended loss" as to each alleged co-conspirator separately. This, the Court did not do. There is no way that Mr. Kergil's "intended loss" for purposes of the Sentencing Guidelines could be more than the amount he charged for his services rendered (which should **NOT** be considered a fraud "loss" in any event), and it is absurd to assume the payment of premiums to a carrier can "add to" rather than subtract from the total loss calculation. Clearly the "intended loss" as well as the actual loss in this case was zero; and certainly from Mr. Kergil's perspective, his "intended loss" was zero as well, regardless of the Court's disdain for Mr. Binday, whose Agency received all of the commissions in this case. *See, e.g., United States v. Platt*, 608 Fed. Appx. 22 (2d Cir. 2015):

> For the purposes of sentencing, mere "knowledge of another participant's criminal acts or of the scope of the overall operation" does not make a defendant criminally responsible and it is less likely that an activity was jointly undertaken if the participants worked independently and did not "pool their profits and resources." *Platt* at 31, *citing United States v. Studley*, 47 F.3d 569, 575 (2d Cir. 1995).

In fact, "intended loss" is defined in the Guidelines as "pecuniary harm that the defendant purposely sought to inflict." *See* U.S.S.G. §2b1.1, cmt. n.3(A)(ii). As the Court knows, the Sentencing Commission recently amended this definition to clarify that the **defendant's subjective intent** is relevant to the intended loss inquiry. *See* U.S.S.G. App. C. amend. 792 (effective Aug. 1, 2015). In adopting that "*Manatau*" standard for all of the Circuits: "To make

this determination, we look to the defendant's subjective expectation, not to the risk of loss to which he may have exposed his victims." *United States v. Manatau*, 647 F.3d 1048, 1050 (10th Cir. 2011). *See, also, United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) ("In ascertaining the intended loss, the district court must determine the defendant's actual intent.").

Therefore, as a matter of law, Mr. Kergil's sentence was both procedurally and substantively unreasonable and should be at the very least reduced to time served. See e.g. the Second Circuit's recent decision in *United States v. Genao,* 869 F.3d 136, 140 (2d Cir. 2017):

> A district court commits procedural error "when it fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence." *United States v. Chu*, 714 F.3d 742, 746 (2d Cir. 2013) A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) *Id.*

## CONCLUSION

Therefore, for the above reasons, Mr. Kergil respectfully requests that the Court vacate his conviction or reduce his sentence to time served and order his immediate release from prison.

Respectfully Submitted,

/s/ James Kevin Kergil
James Kevin Kergil
Reg. No. 66387-054
Petitioner *Pro Se*
Incarcerated Inmate
FPC Canaan
P.O. Box 200
Waymart, PA 18472





Civil DKT
MG

RECEIVER UNIT
SDNY DOCKET UNIT
2017 NOV 14 AM 8:45

Clerk of the Court
United States District Court S.D.N.Y
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312



RECEIVED
NOV 13 2017
CLERK'S OFFICE
S.D.N.Y

USM P3
SDNY

James Kevin Kergil
Reg. No. 66387054
Federal Prison Camp Canaan
PO Box 200
Waymart, PA 18472